**Kelly v. Northeastern Educational Intermediate Unit**

*Jeffrey T. McGuire* and *Jeffrey A. Levine*, for petitioner.

*John G. Audi*, for respondent Northeastern Educational Intermediate Unit No. 19.

*Richard A. Fanucci*, for intervenor/respondent Ellen Nielson.

NEALON, *J.*, February 12, 2014—This appeal under the Right-to-Know Law ("RTKL"), 65 P.S. §§ 67.101 -67.3104, presents an issue of first impression under the RTKL: whether accountants, who are retained by a local agency to conduct an independent audit of the agency, have "contracted to perform a governmental function on behalf of the agency," such that any records in the accountants' possession relating to their communications with members of the agency's board of directors are discoverable as

public records under Section 506(d)(1) of the RTKL, 65 P.S. § 67.506(d)(1)? The parties' appeal also involves the related issue of whether documents pertaining to any such communications constitute the accountants' "work papers underlying an audit" which are expressly exempt from public access under 65 P.S. § 67.708(b)(17)(v).

For an activity to qualify as a "governmental function" of an agency under the standard established in *SWB Yankees*, it must involve a "non-ancillary undertaking" of the agency and a "substantial facet of the agency's role and responsibilities." Although an intermediate unit is required to submit an independent audit to the state secretary of education on an annual basis, the completion of such an audit is an ancillary function of that agency. An independent audit cannot be conducted by an intermediate unit itself, and instead must be performed by an accountant who remains fully independent of the agency being audited. Independent auditors are not subject to the agency's control or direction when conducting an audit, and those auditors alone determine how the audit will be performed and concluded. Consequently, an independent audit is not a principal function of an intermediate unit, and accountants who are hired by the unit to complete that audit do not "perform a governmental function" on behalf of that local agency. Furthermore, any documented communications between the independent auditors and board members of the agency being audited comprise part of the accountants' "work papers underlying an audit" which are specifically exempt from disclosure under the RTKL. Therefore, the accounting firm's appeal under the RTKL will be granted and the administrative determination directing disclosure of those written communications will

be reversed.

## I. FACTUAL BACKGROUND

Intervenor, Ellen Nielsen ("Nielsen"), serves as a member of the board of directors of the Northeastern Educational Intermediate Unit No. 19 ("NEIU"), which is located in Archbald, Lackawanna County and comprised of twenty member school districts in Lackawanna, Wayne and Susquehanna counties.[1] (Transcript of Proceedings ("T.P.") on 1/29/14 at pp. 9, 57). Petitioner, Brian T. Kelly and Associates ("Kelly & Associates"), is an accounting firm that was retained by the NEIU to perform a statutorily required audit in 2013. (Docket entry no. 10 at pp. 1, 4). Upon completing the independent audit, Kelly & Associates presented it to the NEIU Board of Directors, including Nielsen, in an open session. (T.P. 1/29/14 at pp. 9-11, 57-58).

On April 19, 2013, Nielsen delivered a written request to the NEIU's open records officer seeking copies of "any records or documents (emails, telephone records, other correspondence) between any NEIU Board members and the auditing firm of Brian Kelly." (Docket entry no. 13 at p. 2). After securing an extension of time, the open records officer replied to Neilsen's request on May 20,

---

1. An "intermediate unit" such as the NEIU is a "local agency" for purposes of the RTKL, *see* 65 P.S. § 67.102, and the Office of Open Records ("OOR") is the state agency that is charged with the administrative responsibility of deciding appeals by records requesters from local agency denials of written requests for access to records under the RTKL. *See* 65 P.S. §§ 67.1101, 67.1310(a)(5). Under Section 1302 of the RTKL, "the final determination of the [OOR's] appeals officer relating to a decision of a local agency" may be appealed by the filing of a petition for review "with the court of common pleas for the county where the local agency is located." 65 P.S. § 67.1302(a). *See also Ledcke v. County of Lackawanna*, 2013 WL 504447, at *4 (Lacka. Co. 2013).

2013. (*Id.* at p. 1). In its response, the NEIU produced affidavits from fifteen board members, including Nielsen herself, attesting that they did not possess any such records.[2] (*Id.* at pp. 5-20). Two board members, Robert M. Schwartz and Louise Brzuchalski, provided copies of email communications with Kelly & Associates. (*Id.* at pp. 22-42). One board member, Frank Galli, submitted a handwritten response to the NEIU's open records officer which simply stated [y]ou have no right to my personal phone records or computer." (*Id.* at p. 21). The remaining two board members, William Fox and Michael May, did not reply to the open records officer. (T.P. 1/29/14 at pp. 13-14, 53-54, 56).

The president of the board of directors, Robert M. Schwartz, and the board treasurer, Louise Brzuchalski, serve on the NEIU's audit committee. (Docket entry no. 13 at pp. 25, 27, 30, 34-35, 38; T.P. 1/29/14 at 29-30, 45-46, 61-64). Mr. Schwartz and Ms. Brzuchalski both produced emails that they received from Kelly & Associates on February 25, 2013, and March 26, 2013, regarding "adjusting journal entries we have presented and posted...for the June 30, 2012 fiscal year end" and the belated filing of the "single audit report...by April 30, 2013," rather than "the intended due date of March 31, 2013." (Docket entry no. 13 at pp. 25-26, 36-37). Both audit committee members also furnished emails that were exchanged with Kelly & Associates on April 7, 2013, and April 8, 2013, concerning the scheduling of a meeting to

---

2. In addition to his affidavit, board member Alvin Hollister, stated that he "received one (1) phone call during the audit ...which is customary with every audit inquiring as to whether or not I am aware of any misdealings or have any concerns regarding the operation of the NEIU." (*Id.* at p. 13).

"discuss the 'final draft' financial statements for the June 30, 2012 fiscal year end on April 22, 2013." (*Id.* at pp. 27-32, 34-35, 38-39). Additionally, Mr. Schwartz produced an email dated January 8, 2013, that he received from Brian T. Kelly, CPA, with reference to an email communication that the NEIU executive director transmitted to the division chief of the Department of Education's Division of Subsidy Data and Administration, and Ms. Brzuchalski provided an email that she received from Brian T. Kelly, CPA, on May 8, 2013, relating to an inquiry from the Comptroller's Office of the Pennsylvania Office of the Budget, relative to "AFR" data for 2010 to 2012. (*Id.* at pp. 23, 40-42).

Nielsen did not appeal the NEIU's response of May 20, 2013, to the OOR, nor did she otherwise seek more specific answers from Mr. Galli, Mr. Fox, Mr. May or any other board member. (T.P. 1/29/14 at pp. 14-16). Instead, on May 28, 2013, she submitted another right-to-know request to the open records officer of the NEIU demanding that the NEIU secure from Kelly & Associates "any records or documents (emails, telephone records, any other correspondence) between the auditing firm of Brian Kelly and any NEIU 19 Board members." (Docket entry no. 1, exhibit A.). By letter dated June 14, 2013, Brian T. Kelly, CPA, advised the NEIU's open records officer that "under Section 506(d) [of the RTKL], any such request must be related to a governmental function." (*Id.*, exhibit C-1). Mr. Kelly further stated in his correspondence to the NEIU that "the request falls under the exemptions as outlined in Section 708(b)(6)(i)(A) [of the RTKL], and as such, there is no obligation for compliance."[3] (*Id.*).

---

3. Section 708(b) of the RTKL lists records that "are exempt from

On June 20, 2013, the open records officer for the NEIU forwarded a written response to Nielsen stating that the NEIU had "not received any records related to your request from the third party, Brian Kelly." (*Id.*, exhibit B). The open records officer indicated that Mr. Kelly had advised the NEIU that Neilsen's RTKL request "falls under the exemptions as outlined in Section 708(b)(6)(i)(A)," and that "there [wa]s no obligation for compliance." (*Id.*). The NEIU's open records officer concluded her response by stating that the NEIU "is therefore not denying nor granting your request." (*Id.*).

On July 12, 2013, Nielsen appealed the NEIU's denial to the OOR, and on that same date, the NEIU furnished Kelly & Associates "with a copy of the appeal" and informed them "that parties with a direct interest in the records may file a request with the OOR to participate in the appeal."[4] (Docket entry no. 1, exhibit D at p. 2). On July 29, 2013, Kelly & Associates filed a written request to participate in the appeal, and the OOR granted that request "and extended the record closing date until August 1, 2013, to

access by a requester," and Section 708(b)(6)(i)(A) cited by Mr. Kelly exempts "[a] record containing all or part of a person's social security number, driver's license number, personal financial information, home, cellular or personal telephone numbers, personal e-mail addresses, employee number or other confidential personal identification number." 65 P.S. § 67.708(b)(6)(i)(A).

4. Section 1101 of the RTKL governs appeals to the OOR, and states that "[a] person other than the agency or requester with a direct interest in the record subject to an appeal under this section may, within 15 days following receipt of actual knowledge of the appeal but no later than the date the appeals officer issues an order, file a written request to provide information or to appear before the appeals officer or to file information in support of the requester's or agency's position." 65 P.S. § 67.1101(c)(1). The OOR appeals officer may grant such a request to participate or appear, provided that "no hearing has been held," "the appeals officer has not yet issued its order," and "the appeals officer believes the information will be probative." 65 P.S. § 67.1101(c)(2).

allow Brian T. Kelly and Associates an opportunity to file a legal argument." (*Id*). Kelly & Associates filed a timely submission in which they argued that their audit work papers are exempt from public access "under 65 P.S. § 67.708(b)(17)(v)," and that Kelly & Associates had not been contracted to perform a "governmental function," as that phrase is defined in Section 506(d)(1) of the RTKL, 65 P.S. § 67.506(d)(1).[5] (*Id.* at pp. 2-3). According to the OOR's appeals officer, "neither party requested a hearing, and the OOR ha[d] the necessary, requisite information and evidence before it to property adjudicate the matter." (*Id.* at p. 3).

With respect to Kelly & Associates' argument that audit work papers are exempt from public access under the RTKL, the OOR reasoned that "[b]ecause neither NEIU 19, nor Brian Kelly and Associates have provided an affidavit or other sufficient evidence to support those factual assertions, the OOR has no basis to assess whether these assertions are factually accurate." (*Id.* at pp. 4-5). Ostensibly due to the lack of such "an affidavit or other sufficient evidence," the OOR found that "any records in the possession of NEIU 19 are required to be disclosed." (*Id.* at p. 5). Moreover, with regard to Kelly & Associates' "governmental function" contention, the OOR concluded that "[a]uditing services for a governmental unit are a governmental function, and the records requested,

---

5. Among the materials that are exempt from disclosure under Section 708(b) of the RTKL are "[w]ork papers underlying an audit." 65 P.S. § 67.708(b)(17)(v). Section 506(d)(1) expands the definition of a "public record" under the RTKL to include any "record that is not in the possession of an agency but is in the possession of a party with whom the agency has contracted to perform a governmental function on behalf of the agency, and which directly relates to the governmental function...." 65 P.S. § 67.506(d)(1).

documents between contractor and client, directly relate to that governmental function." (*Id.* at p. 6). As a result, the OOR granted Nielsen's appeal on August 12, 2013, and ordered the NEIU "to provide all responsive records to [Nielsen] within thirty (30) days." (*Id.* at p. 6).

On September 10, 2013, Kelly & Associates filed a "Petition for Review of Final Determination of the Pennsylvania Department of Open Records," asserting that the OOR decision "is contrary to Pennsylvania law" and "not supported by the evidence."[6] (Docket entry no. 1 at ¶ 9). More specifically, Kelly & Associates contend that the OOR "erred in holding that the auditing records of Brian T. Kelly and Associates, a third party contractor, are public records" under the RTKL, and "in failing to recognize the statutory exemption alleged by Brian T. Kelley and Associates." (*Id.* at ¶ 9(b), (f)). Kelly &

---

6. The parties in the administrative appeal before the OOR were the requester, Nielsen, the local agency, NEIU which was identified as the "respondent," and Kelly & Associates who were designated as the "direct interest participant." (Docket entry No. 1, exhibit D at p. 1). Kelly & Associates' petition for review of the OOR determination identifies the OOR as the sale respondent. The RTKL provides that the local agency, the requester and the OOR or designated appeals officer are to "be served notice of actions commenced" under 65 P.S. § 67.1302 governing appeals to the common pleas courts of OOR final determinations relating to a local agency, and to "have an opportunity to respond in accordance with applicable court rules." 65 P.S. § 67.1303(a). The OOR does not have standing to defend its final determinations since it is not aggrieved by the release of another agency's records, and for that reason, it should not be the named respondent in a judicial appeal. *Com., Pennsylvania Gaming Control Board v. Office of Open Records*, 48 A.3d 503, 506 n. 8 (Pa. Cmwlth. 2012) (*en banc*), *app. granted on other grounds*, 74 A.3d 1027 (Pa. 2013); *East Stroudsburg University Foundation v. Office of Open Records*, 995 A.2d 495,507 (Pa. Cmwlth. 2010)(*en banc*), *app. denied*, 610 Pa. 602, 20 A.3d 490 (2011). Instead, the governmental agency "is the proper respondent because it is the agency from which the records are requested." *Padgett v. Pennsylvania State Police*, 73 A.3d 644, 648 n. 5 (Pa. Cmwlth. 2013). Therefore, OOR has been removed, sua sponte, as the named respondent, and in its stead, the NEIU has been substituted as the proper respondent, along with the intervening requester, Nielsen.

Associates also requested in their petition that "the court schedule a hearing in this matter and render its decision de novo in this appeal." (*Id.* at ¶ 10).

By notice dated December 13, 2013, the court administrator established deadlines for the filing of the parties' briefs, and scheduled a hearing for January 29, 2014. (T.P. on 1/29/14 at p. 5). A hearing was conducted on that date, at the conclusion of which the parties were afforded the opportunity to supplement the evidentiary record within ten days. (*Id.* at pp. 64-65). Upon the filing of Nielsen's post-hearing submissions on February 7, 2014, this matter became ripe for disposition. (Docket entry no. 13).

## II. DISCUSSION

### (A) STANDARD AND SCOPE OF REVIEW

Kelly & Associates maintain that "[i]t is not clear under the current Right-to-Know Law what standard of review was intended," but nonetheless "request a de novo review" so that they may "be allowed to submit evidence." (Docket entry no. 11 at p. 2). "'Standard of review' and 'scope of review,' although distinct, are not concepts that are considered in isolation from one another." *Bowling v. Office of Open Records*, 75 A.3d 453, 475 (Pa. 2013). "Scope of review" refers to the confines within which a reviewing court must conduct its examination, "or to the matters (or 'what') the [reviewing] court is permitted to examine." *Samuel-Bassett v. Kia Motors America. Inc.*, 613 Pa. 371, 407, 34 A.3d 1, 21 (2011), *cert. denied*, 133 S. Ct. 51 (U.S. 2012). "Standard of review" concerns the manner in which (or "how") that examination is to be conducted. *Holt v. 2011 Legislative Reapportionment*

*Commission*, 614 Pa. 364, 392, 38 A.3d 711, 728 (2012); *Mid Valley School District v. Warshawer*, 2013 WL 5234308, at \*4 (Lacka. Co. 2013).

Section 1302(a) of the RTKL addresses the manner in which the common pleas court must consider a petition for review involving a "local agency," and states that the decision of the court "shall contain findings of fact and conclusions of law based upon the evidence as a whole" and "shall clearly and concisely explain the rationale for the decision." 65 P.S. § 67.1302(a). The Supreme Court of Pennsylvania recently clarified the appropriate standard of review under 65 P.S. § 67.1302, and concluded that the common pleas courts "are the ultimate finders of fact and that they are to conduct full de novo reviews of appeals from decisions made by the RTKL appeals officers, allowing for the adoption of the appeal officer's factual findings and legal conclusions when appropriate." *Bowling*, 75 A.3d at 474.

As for the scope of review, Section 1303(b) of the RTKL states that the record on appeal before a common pleas court "shall consist of the request, the agency's response, the appeal filed under section 1101, the hearing transcript, if any, and the final written determination of the appeals officer." 65 P.S. § 67.1303(b). However, Section 1303(b) does not restrict the scope of the record on appeal, and to the contrary, simply describes the record to be certified by the OOR to the reviewing court. As a consequence, the "scope of review" is plenary and permits trial courts "to expand their record to fulfill their statutory role" as factfinders and thereby consider matters beyond the record that is certified by the OOR. *Bowling*, 75 A.3d at 476. Accordingly, the "standard of review is *de novo* and [the]

scope of review is broad or plenary when [a court] hears appeals from determinations made by appeals officers under the RTKL." *Id.* at 477.

## (B) AUDIT WORK PAPERS

Kelly & Associates first contend that the records requested by Nielsen constitute audit "work papers" which are protected from disclosure under the RTKL. Citing Section 9.11 of the Pennsylvania CPA Law, 63 P.S. § 9.11, Kelly & Associates argue that working papers prepared or compiled by a certified public accountant "incident to or in the course of rendering services to a client pursuant to the practice of public accounting" are the property of the certified public accountant. (Docket entry no. 11 at p. 3). In light of the affidavit filed by Brian T. Kelly, CPA, attesting "that the only documents in [his] possession which relate to Northeastern Educational Intermediate Unit 19 are my 'working papers' as defined by the Pennsylvania CPA Law," Kelly & Associates submit that they do not possess any documents that are subject to disclosure under the RTKL. (*Id.* at pp. 3-4 & exhibit E). In reply, Nielsen alleges that "emails or other correspondence that may have been generated by a CPA do not automatically fall under the blanket category of 'work papers underlying an audit.'" (Docket entry no. 12 at pp. 5-6).

Act 3 of February 14, 2008, made significant changes to the RTKL, resulting in "a dramatic expansion of the public's access to government documents." *Levy v. Senate of Pennsylvania*, 65 A.3d 361, 381 (Pa. 2013). Under the earlier version of the RTKL, "[t]he burden of establishing that requested material bears characteristics of a public record rest[ed] upon the party seeking access." *LaValle*

*v. Office of General Counsel*, 564 Pa. 482, 497, 769 A.2d 449, 458 (2001). In contrast, "[u]nder the new law, agency records are presumed to be public records, accessible for inspection and copying by anyone requesting them, and must be made available to a requester unless they fall within specific, enumerated exceptions or are privileged." *Bowling*, 75 A.3d at 457. "To justify a determination to deny a requester access to a requested record, the relevant government agency bears the 'burden of proving...by a preponderance of the evidence' that an exception applies." *Id.*

Section 708(b) of the RTKL itemizes those records which are exempt from public access by a requester. *See* 65 P.S. § 67.708(b)(1)-(30). The statutory exemptions from disclosure are to be narrowly construed due to the RTKL's remedial nature, *see Office of Governor v. Scolforo*, 65 A.3d 1095, 1100 (Pa. Cmwlth. 2013), and the NEIU and Kelly & Associates bear the burden of proving, by a preponderance of the evidence, that the records requested by Nielsen are exempt from access under the RTKL. *See* 65 P.S. § 67.708(a)(1). As noted in note 5, *supra*. Section 708(b)(17)(v) expressly exempts "[w]ork papers underlying an audit." 65 P.S. § 67.708(b)(17)(v). There are no reported decisions in Pennsylvania addressing the audit work papers exemption or the scope of that exemption.

Nielsen does not contest the exemption status accorded to audit work papers, but asserts that any emails, correspondence or other documents between Kelly & Associates and any NEIU Board members do not necessarily qualify as audit working papers. (Docket entry no. 12 at pp. 5-6). Neither the RTKL, nor the CPA Law, specifically defines "work papers" related to an

audit. *See* 63 P.S. § 9.2; 65 P.S. § 67.102. The RTKL's only explanatory reference to "work papers underlying an audit" is contained in the definition of the phrase "financial record." The RTKL generally defines a "public record" as "[a] record, including a financial record, of a Commonwealth or local agency...," and further defines a "financial record" as, *inter alia*, "[a] financial audit report," albeit with the express caveat that "[t]he term does not include work papers underlying an audit." 65 P.S. § 67.102. Thus, "work papers underlying an audit" are expressly excluded from the statutory definition of a "financial record" which may be considered a "public record" under the RTKL. However, the RTKL does not define audit "work papers" with any more particularity, or otherwise indicate whether they include communications between Kelly & Associates and the NEIU Board members in connection with their audit.

It is firmly established that "when a statute fails to define a term, the term's ordinary usage applies," and that "dictionaries provide substantial evidence of a term's ordinary usage." *Coulter v. Department of Public Welfare*, 65 A.3d 1085, 1088 n. 7 (Pa. Cmwlth. 2013); *Department of Health v. Office of Open Records*, 4 A.3d 803, 810 (Pa. Cmwlth. 2010). Black's Law Dictionary defines "working papers" as:

> *Accounting.* The records kept by an independent auditor of the procedures followed, tests performed, information obtained, and conclusions reached in an audit. A reviewer may evaluate the quality of an audit by examining the working papers.

Black's Law Dictionary 1745 (9th ed. 2009). Other

jurisdictions which have addressed open records disputes involving audit records have applied the definition of "working papers" set forth in Black's Law Dictionary. *See, e.g., Kyle v. Perrilloux*, 868 So.2d 27, 29 n. 2 (La. Ct. App. 1st. Cir. 2003); *Goode v. New Hampshire Office of the Legislative Budget Assistant*, 148 N.H. 551, 557, 813 A.2d 381, 388 (2002). A virtually identical definition is contained in the Statements on Auditing Standards ("SAS") issued by the American Institute of Certified Public Accountants ("AICPA"). *See State ex rel. Mazzaro v. Ferguson*, 49 Ohio St. 3d 37, 37 n. 1, 550 N.E.2d 464, 465 n. 1 (1990) (quoting Section 339.03 of the SAS defining "working papers" as records of "the procedures applied, the tests performed, the information obtained, and the pertinent conclusions reached in the engagement."); *U.S. v. Kroger Company*, 566 F. Supp. 1432, 1435 (S.D. Ohio 1983) (quoting Section 4024.2 of the internal revenue manual incorporating definition of "audit work papers" in the SAS); *see also* Leo R. Beus, *Collecting Evidence for the Audit Malpractice Case*, 14 No. 1 Prac. Litigator 7, 8 (January 2003).

It is noteworthy that Nielsen seeks to compel the requested records from Kelly & Associates rather than the NEIU and its board members. The accountant-client privilege is waivable by the client, *see Agra Enterprises, Inc. v. Brunozzi*, 302 Pa. Super. 166, 171 n. 1, 448 A.2d 579, 582 n.1 (1982) (under the accountant-client privilege codified in Section 9.11a of the CPA Law, 63 P.S. § 9.11a, "the right to grant or withhold permission to speak lies in the client"), and two board members have waived that privilege by producing copies of their communications with Kelly & Associates. Instead of demanding further

production directly from the NEIU and its board members, Nielsen seeks to secure the records in question from the independent auditors, Kelly & Associates, which assert that the only documents in their possession are work papers that are their property alone. *See Brett Senior & Associates. P.C. v. Fitzgerald*, 2007 WL 2043377, at *7 (E.D. Pa. 2007) (citing 63 P.S. § 9.11(a) and stating that "work papers...under Pennsylvania law remain an accountant's property absent an agreement with the client").

To qualify as protected "working papers," any communications between Kelly & Associates and the NEIU board members must relate to the procedures followed, tests performed, information obtained, or conclusions reached in conjunction with the audit. Any materials reflecting the evidentiary basis for the audit report would likewise constitute "work papers." *See SCM Corp. v. United States*, 645 F.2d 893, 899 (Ct. CI. 1981); *Pippins v. KPMG. LLP*, 921 F. Supp. 2d 26, 37 (S.D.N.Y. 2012). In his affidavit dated January 6, 2014, Brian T. Kelly, CPA "swear[s] that the only documents in my possession which relate to Northeastern Educational Intermediate Unit 19 are my 'Working Papers' as defined by the Pennsylvania CPA Law." (Docket entry no. 11, exhibit E). However, as noted above, the CPA Law does not contain a definition of "working papers." *See* 63 P.S. § 9.2.

The email communications that were produced by the NEIU board members on the audit committee, Mr. Schwartz and Ms. Brzuchalski, concern the following five subjects:

1. Mr. Kelly's solicitation of Mr. Schwartz's "thoughts" regarding the reasons provided by NEIU's Executive Director to the Department of Education for the NEIU's delay in filing its annual financial report. (Docket entry no. 13 at pp. 23-24);

2. The "adjusting journal entries [Kelly & Associates] have presented and posted...for the June 30, 2012 fiscal year end." (*Id.* at pp. 25, 36);

3. Kelly & Associates' delay in filing the NEIU's "single audit report" on April 30, 2013, rather than the anticipated date of March 31, 2013, "[d]ue to a longer than expected response from the State regarding indirect cost rate calculations and other procedural questions." (*Id.* at pp. 26, 37);

4. The scheduling of a meeting between Kelly & Associates and the audit committee to review "and discuss the 'final draft' financial statements for the June 30, 2012 fiscal year end." (*Id.* at pp. 27-32, 34-35, 38-39); and

5. Kelly & Associates' reply to NEIU staff concerning the NEIU's response to an inquiry from the Comptroller's Office of the Pennsylvania Office of the Budget pertaining to "AFR 2012 data to compile federal reports." (*Id.* at pp. 40-42).

The foregoing communications appear to relate to the independent auditors' procedures, testing, investigations, conclusions and evidentiary support. Although Nielsen alleges that there may be other communications between Kelly & Associates and the NEIU board members which "do not automatically fall under the blanket category of 'work papers underlying an audit,'" there is no basis in

the available record for such a conclusion. Nielsen has not requested that Kelly & Associates submit any purported communications with NEIU board members for an *in camera* review to determine whether they comprise documents that are protected as "work papers." *See Office of Governor v. Bari*, 20 A.3d 634, 648 (Pa. Cmwlth. 2011) (holding that in deciding whether "an exemption under Section 708(b) of the RTKL applies" and "potentially confidential information of a private entity" should be disclosed, "OOR should take all necessary precautions, such as conducting a hearing or performing *in camera* review, before providing access" to such information); *Pennsylvania State Police v. Office of Open Records*, 5 A.3d 473, 477 (Pa. Cmwlth. 2010) (noting that the reviewing court may consider "evidence that was not before the OOR, including 'an *in camera* review of the documents at issue'"), *app. denied*, 76 A.3d 540 (Pa. 2013).

Kelly & Associates bear the burden of proving by a preponderance of the evidence that the records requested by Nielsen are exempt from public access. *See Coley v. Philadelphia District Attorney's Office*, 77 A.3d 694, 696-697 (Pa. Cmwlth. 2013) (quoting 65 P.S. § 67.708(a)(1)). A preponderance of the evidence "is such proof as leads the fact-finder to find that the existence of a contested fact is more probable than its nonexistence." *Pennsylvania State Troopers Ass'n v. Scolforo*, 18 A.3d 435, 439 (Pa. Cmwlth. 2011). The OOR appeals officer rejected Kelly & Associates' "work papers" argument since they failed to provide "an affidavit or other sufficient evidence to support those factual assertions." (Docket entry no. 1, exhibit D at p. 5). On appeal, Brian T. Kelly, CPA, has submitted an affidavit attesting that the only documents in the custody

of Kelly & Associates are audit "working papers," and the email communications produced to date qualify as Kelly & Associates' "work papers underlying an audit."

Accordingly, based upon the evidentiary record submitted by the parties, it is "more probable" than not that the only records in the possession of Kelly & Associates, including their communications with NEIU board members, constitute audit "work papers" which are expressly exempt from disclosure under Section 708(b)(17)(v) of the RTKL. Nevertheless, assuming for the sake of argument that any documents in Kelly & Associates' custody relating to their communications with NEIU board members do not fall within the ambit of "work papers underlying an audit," those records would be publicly accessible under the RTKL only if Kelly & Associates had "contracted to perform a governmental function" on behalf of the NEIU. In the interests of completeness and finality, the issue of whether Kelly & Associates performed a "governmental function" for the NEIU will, therefore, be addressed below.

## (C) RECORDS OF INDEPENDENT CONTRACTORS

The current RTKL expands the definition of a "public record" so as to authorize access to the records of certain third party contractors. Section 506(d)(1) of the RTKL provides that "[a] public record that is not in the possession of an agency but is in the possession of a party with whom the agency has contracted to perform a governmental function on behalf of the agency, and which directly relates to the governmental function and is not exempt under this act, shall be considered a public record of the agency for purposes of this act." 65 P.S.

§ 67.506(d)(1). "Section 506(d)(1) makes records that directly relate to a governmental function performed on behalf of an agency by a contracted party public records of that agency." *Breslin v. Dickinson Township*, 68 A.3d 49, 53 (Pa.Cmwlth.2013).

Kelly and Associates submit that they were not "contracted to perform a governmental function on behalf of the [NEIU]" since "[n]o governmental agency can perform an audit." (Docket entry no. 11 at p. 4). They assert that "CPA firms have numerous ethical and statutory requirements to maintain their independence and remain free from conflicts of interest when performing audits," and that "[f]orcing a CPA firm to stand in the shoes of the governmental entity which it is auditing will break the CPA firm's independence." (*Id.* at pp. 4-5). Based upon that reasoning, Kelly & Associates posit that they "cannot be held to be performing a governmental function because the [NEIU] cannot perform an audit." (*Id.* at p. 4). Neilsen counters that since governmental agencies like the NEIU are required to have independent audits conducted, "[t]here is no question that [Kelly and Associates] are performing a 'governmental function,' i.e., one which is required of the agency by law." (Docket entry no. 12 at p. 4).

The RTKL does not define the phrase "governmental function" for purposes of Section 506(d)(1). In *East Stroudsburg, supra,* the Commonwealth Court of Pennsylvania interpreted that language broadly and held "that all contracts that governmental entities enter into with private contractors necessarily carry out a 'governmental function' because the government always acts as the government." *East Stroudsburg,* 995 A.2d at 504. However, in *SWB Yankees LLC v. Wintermantel,*

615 Pa. 640, 45 A.3d 1029 (2012), the Supreme Court of Pennsylvania stated "that the government-always-acts-as-government overlay of the *East Stroudsburg* majority is too broad for purposes of Section 506," and that "the legislature used the 'governmental' function delimiter in Section 506 to narrow the category of third party records subject to disclosure by some measure, [citation omitted], presumably on account of the burden, expense, and other impositions attending wholesale disclosure." *Id.* at 662, 45 A.3d at 1042. Instead, it "conclude[d] that it is the delegation of some non-ancillary undertaking of government...that should control." *Id.*

The Supreme Court in *SWB Yankees* interpreted the "governmental function" requirement as "connot[ing] an act of delegation of some substantial facet of the agency's role and responsibilities, as opposed to entry into routine service agreements with independent contractors." *Id.* at 664, 45 A.3d at 1043. For example, "where a government agency's primary activities are defined by statute as 'essential governmental functions' and such entity delegates one of the main functions to a private entity via the conferral of agency status, Section 506(d)(1) pertains on its terms to non-exempted records directly relating to the function."[7] *Id.* at 664, 45 A.3d at 1043-1044. Since

_____

7. Even if the independent contractor "has contracted to perform a governmental function on behalf of the agency," its records may be considered "public records" under the RTKL only if they "directly relate to the governmental function." *Buehl v. Office of Open Records*, 6 A.3d 27, 30 (Pa. Cmwlth. 2010). "Section 506(d) does not reach all records in possession of a private contractor that relate to the governmental function; rather, the records reached are only those that relate to *performance of that function*." *Allegheny County Department of Administrative Services v. Parsons*, 61 A.3d 336, 346 (Pa. Cmwlth. 2013) (emphasis in original), *app. denied*, 72 A.3d 604 (Pa. 2013). "Assessing a direct relationship requires careful review of the contract at issue and the information related

the county stadium authority in *SWB Yankees* had been formed under the Municipality Authorities Act, 53 Pa. C.S. §§ 5601-5623, for the sole purpose of operating and managing a multi-purpose stadium and Triple-A Baseball team, and the stadium authority had contractually delegated the management of the stadium and team to a private contractor, that third-party contractor was found to have "contracted to perform a governmental function" on behalf of the stadium authority. *Id.* at 642-644, 664, 45 A.3d at 1030-1031, 1044.

There are few reported decisions applying the "governmental function" test formulated in *SWB Yankees*. In *Parsons, supra,* the Allegheny County Office of Children, Youth and Families had entered into a contract with A Second Chance, Inc. ("ASCI") "to perform direct social services for the County," primarily "as part of the foster care program that seeks to place children with family and friends of family." *Parson,* 61 A.3d at 339. In affirming its original determination "that the social services ASCI performs through its contract with the County constitute a governmental function," the Commonwealth Court reasoned "[t]hat determination remains unaltered by our Supreme Court's decision in *SWB Yankees. LLC v. Wintermantel/The Scranton Times-Tribune,* because social services are a core function of government, not an ancillary one." *Id.* at 343.

In a subsequent unreported panel decision, the Commonwealth Court considered the *SWB Yankees* standard in connection with a right-to-know request for access to speed-timing device calibration information in

to performing the contractual obligations." *Id.* at 344.

the possession of a municipality's third-party contractor. In *Municipality of Monroeville v. Drack*, 2013 WL 3716891 (Pa. Cmwlth. 2013), the municipality of Monroeville contracted annually with a private entity to perform calibration testing on ENRADD speed timing devices. *Id.* at *2. Under the Pennsylvania Vehicle Code, "law enforcement, such as [Monroeville's] police department, is responsible for calibration of the devices," and has the statutory burden "to periodically test and calibrate the authorized devices to ensure that speeding violations can be competently prosecuted." *Id.* at *4-5. "As a matter of proof, a municipality must establish the accurate calibration of any speed timing devices" as "a necessary pre-condition to successful prosecution of speeding violations." *Id.* at *5. Since Monroeville's third party contract "for calibration services is necessary to perform its speed law enforcement role," the Commonwealth Court held that "this contracted function is inseparable from a governmental purpose." *Id.*

Recently, we had occasion to apply the *SWB Yankees* criteria in a RTKL dispute involving records of an architect and construction manager for an elementary school construction project. Under the Public School Code, school districts are charged with the responsibility of furnishing "suitable school buildings" which must be "constructed, furnished, equipped, and maintained in a proper manner." 24 P.S. § 7-701. Finding that "the construction and maintenance of suitable school buildings are non-ancillary governmental functions of a school district," we concluded that "to the extent that the [school] District delegated that statutory responsibility to [the project architect and construction manager], any records that directly relate to the services that those independent

contractors rendered in connection with the Mid Valley Elementary School project are discoverable under Section 506(d)(1)." *Mid Valley School District v. Warshawer*, 2013 WL 5234308, at *10 (Lacka. Co. 2013). Pertinent documents within the custody of those contractors were held to be discoverable under the RTKL inasmuch as those contractors were contractually vested with "the authority to act on the district's behalf during the elementary school construction, including the responsibility (1) for determining if the work complied with the contractual requirements, (2) for discovering deficiencies in the construction work, (3) for reviewing and certifying the contractors' applications for payment, and (4) for rejecting any work that did not conform to the contract." *Id.* at *11.

Under the *SWB Yankees* test, "[t]o qualify as governmental, the function must be substantial facet of a governmental activity." *In re Right to Know Law Request Served On Venago County's Tourism Promotion Agency*, 2014 WL 28676, at *6 (Pa. Cmwlth. 2014) (citing *SWB Yankees*). Functions are deemed to be ancillary if they "do not fulfill a core purpose of a governmental agency." *Id.* Consequently, it must be determined whether an independent audit constitutes a "substantial facet of the [NEIU's] role" or merely an ancillary function of that local agency. Kelly & Associates and Nielsen agree that this issue presents a question of "first impression" under the RTKL. (Docket entry no. 11 at p. 4; T.P. 1/29/14 at pp. 33-34, 39).

By virtue of a 1970 amendment to the Public School Code of 1949, the act of May 4, 1970, P.L. 311, No. 102, § 1, 24 P.S. §§ 9-951 to 9-971, renumbered as 24 P.S. §§ 9-901-A to 9-921-A in 2011, "intermediate units were established

as part of the public school system in the Commonwealth," and "[e]ach school district in the Commonwealth was assigned to one of the 29 intermediate units created by the amendment." *Northeastern Educational Intermediate Unit 19 v. Com., Office of Auditor General*, 84 Pa. Cmwlth. 531, 532 n. 1, 479 A.2d 1166, 1167 n. 1 (1984). School districts located in Lackawanna, Wayne and Susquehanna counties were arranged in Intermediate Unit No. 19. *See* 24 P.S. § 9-902-A. "Intermediate units were established as successors to the county boards of school directors," *Denchy v. Education and Training Consultants of PA, Inc.*, 803 F. Supp. 1055, 1058 (E.D. Pa, 1992), in order to "provide on a regional basis certain educational services to each intermediate unit." *In re Audit of Campaign Expenses Filed with Northampton County Election Board*, 747 A.2d 1262, 1269 (Pa. Cmwlth. 2000). "Each unit has a board of directors drawn from school directors from the school districts within its territorial jurisdiction." *Arnold v. BLaST Intermediate Unit 17*, 843 F.2d 122, 124(3d Cir. 1988).

As a legislatively created entity, an intermediate unit possess only those powers and duties as are granted to it by the general assembly. *In re Audit of Campaign Expenses Filed with Northampton County Election Board*, *supra*; *Kaufman v. Central Susquehanna Intermediate Unit No. 16*, 144 Pa. Cmwlth. 163, 166,601 A.2d 412, 414 (1991). Article IX-A of the Public School Code delineates the statutory responsibilities of intermediate units, which include the authority to: (1) "adopt the program of services to be provided by the intermediate unit," and annually "to submit a program of services for the next school year to the superintendent of public instruction for

budgetary approval," 24 P.S. § 9-906-A; (2) receive state subsidies "for services performed" and to "submit to the department of education a report on subsidies and funds received," 24 P.S. § 9-907-A(a)-(b); (3) provide "special pupil" services, 24 P.S. § 9-908-A, vocational-technical education, 24 P.S. § 9-909-A, and "auxiliary services," 24 P.S. § 9-922.1-A, including psychological services, 24 P.S. § 9-923.1-A, and visual services, 24 P.S. § 9-923.2-A; (4) "contract with private residential rehabilitative institutions for educational services to be provided to children as part of any rehabilitative program," 24 P.S. § 9-914.1-A(a); (5) adopt and advertise the intermediate unit budget and conduct programs of services authorized by the state board of education, 24 P.S. § 9-914-A; and (6) "submit to the superintendent of public instruction for prior review and approval, a budget estimating the cost of operating and administering the intermediate program of services for the ensuing school year." 24 P.S. § 9-918-A(a). More importantly to the case at hand, each intermediate unit must submit an annual financial report to the secretary of education "together with an auditor's report prepared by an independent auditor who shall be a certified public accountant or other competent public accountant." 24 P.S. § 9-921-A(a). *See also Reich v. Berks County Intermediate Unit No. 14*, 861 A.2d 1005, 1011 (Pa. Cmwlth. 2004) ("...each IU is required to submit an annual financial report to the Secretary of Education by the first day of October, along with an auditor's report prepared by an independent auditor who is a CPA or other competent public accountant"), *app. denied*, 584 Pa. 689, 881 A.2d 821 (2005).

The statutory requirement of an annual audit by an

independent auditor is not unique to intermediate units. Indeed, various local agencies such as counties, cities, boroughs, townships, and school districts are empowered by statute to contract with an independent certified public accountant to perform an audit of their finances and operations.[8] Regulations promulgated by the state board of accountancy direct that a certified public accountant may not perform an "attest activity," such as an audit, "for an enterprise in a manner to imply that he is acting as an independent public accountant with respect thereto unless he is independent with respect to the enterprise." 49 Pa. Code § 11.21. Kelly & Associates argue that "[b]ecause the auditor must be independent and what they do cannot be done by the governmental agency, [Kelly & Associates] cannot perform a governmental function, nor are they subject to a Right-to-Know request." (Docket entry no. 11 at p. 5).

A contract to perform an independent audit is functionally distinguishable from a stadium authority's plenary delegation of its sole function of managing a stadium and baseball team, see *SWB Yankees*, a county's assignment of its social services responsibility, *see Parsons*,

---

8. *See, e.g.*, 16 P.S. § 1702(b) (The County Code); 53 Pa. C.S. § 3152 (Home Rule/Optional Plan municipalities); 53 P.S. § 36704(d) (Third Class City Code); 53 P.S. § 46005(7) (The Borough Code); 53 P.S. § 55520 (First Class Township Code); 53 P.S. § 65917(a), (d) (Second Class Township Code); 72 P.S. § 5511.26(b)(2) (local taxing districts); 24 P.S. § 24-2401(4), (11) (Public School Code). Municipal authorities and commissions have also been granted the authority to enter into contracts with certified public accountants for the performance of independent audits. *See, e.g.*, 73 P.S. § 380 (Economic Development Financing Law); 16 P.S. § 2399.13(e) (Third Class County Convention Center Authorities); 53 P.S. §§ 12720.207,28207 (Pennsylvania Intergovernmental Cooperation Authorities); 55 P.S. § 697.10 (Philadelphia Regional Port Authority Act); 55 P.S. § 698.30 (Port of Pittsburgh Commission Act); 64 Pa. C.S. § 6012(e) (Pennsylvania Convention Center Authority); 74 Pa. C.S. § 1752(b) (Metropolitan Transportation Authorities).

or a municipal police department's consignment of its duty to calibrate speed-timing devices, *see Drack*. When entering into those forms of contractual arrangements, the government agency has considerable discretion and input regarding the terms of the parties' agreement, and largely prescribes the manner in which those services are to be provided. In contrast, a certified public accountant conducting an independent audit of a governmental agency is not subject to that agency's control or direction, and the auditor alone determines how the audit will be performed and what conclusions will be reached. That mandated independence distinguishes a statutorily required audit from the governmental functions that were performed by the private contractors in *SWB Yankees, Parsons* and *Drack*.

The primary function of an intermediate unit is to provide and operate "additional classes or schools as are necessary" for the "proper education and training" of "all exceptional children" if the school district "cannot provide an appropriate program effectively and efficiently." *Bermudian Springs School District v. Com., Dept. of Education*, 82 Pa. Cmwlth. 566, 570-571, 475 A.2d 943, 945-946 (1984) (quoting 24 P.S. § 13-1372(4) and 22 Pa. Code § 13.11(b)). As the successors to the former county boards of school directors, intermediate units' other major roles include the furnishing of "special pupil services," "vocational-technical education," and "auxiliary services" such as psychological services, visual services, speech and hearing services, remedial services, and services for exceptional children at public and non-public schools. *See* 24 P.S. §§ 9-908-A, 9-909-A, 9-914-A(7), 9-922.1-A, 9-923.1-A, 9-923.2-A. The submission of an independent

auditor's report to the secretary of education is not a principal function of an intermediate unit.[9] The NEIU does not "delegate[ ] one of [its] main functions to a private entity via the conferral of agency status," *SWB Yankees, supra* at 664, 45 A.3d at 1044, when it retains a certified public accountant to prepare an independent audit in accordance with 24 P.S. § 9-921-A(a). As Kelly & Associates have aptly noted, a local agency like the NEIU cannot perform an independent audit of itself, and an accounting firm performing an audit must remain wholly independent from the agency it audits. Thus, under the *SWB Yankees* test, an independent auditor does not "perform a governmental function on behalf of the agency" when it conducts a statutorily required audit of the agency.[10]

---

9. Intermediate units are also subject to audits of their finances by public officials who are not private contractors, such as the Auditor General of Pennsylvania pursuant to Section 403 of the Fiscal Code, 72 P.S. § 403. *See Northeastern Educational Intermediate Unit No. 19 v. Com., Office of Auditor General*, 88 Pa. Cmwlth. 314, 316,489 A.2d 966, 967 (1985).

10. The OOR concluded that since an intermediate unit audit is required by Section 9-921-A(a) of the Public School Code, 24 P.S. § 9-921-A(a), to submit an independent auditor's report to the Secretary of Education on an annual basis, Kelly & Associates performed "a governmental function" on behalf of the NEIU. (Docket entry no. 1, exhibit D at p. 6). Simply because a statute requires certain action by a local agency does not transform the delegation of that task to a third-party contractor into a contract "to perform a governmental function on behalf of the agency." For example, under Section 709 of the Sunshine Act, 65 Pa.C.S.A. § 709, local agencies must publish advance public notice of their meetings in a newspaper of general circulation. *See Higgins v. Public School Employees' Retirement System*, 736 A.2d 745, 754 n. 19 (Pa. Cmwlth. 1999). If the agency's contractual arrangement with a local newspaper for publication of that public notice were deemed to be a contract "to perform a governmental function on behalf of the agency," requesters could serve RTKL requests upon agencies for records in the possession of the newspaper relating to its calculation of advertising rates under the Newspaper Advertising Act, 45 Pa. C.S. §§ 301-310, the basis for establishing those rates, and other proprietary information related to those charges. However, the Supreme Court rejected the "government-always-acts-as-government" paradigm in *SWB Yankees*, and a

The legislative history of act 3 of February 14, 2008, as reflected in the floor debates and lawmakers' remarks, supports such an interpretation of the "governmental function" requirement. *See Board of Revision of Taxes, City of Philadelphia v. City of Philadelphia*, 607 Pa. 104, 129 n. 10, 4 A.3d 610, 624 n. 10 (2010) ("Although lawmakers' statements during debate are generally not dispositive of legislative intent, especially where they serve to challenge the plain language of the statute as enacted, [citations omitted], legislative history 'is nonetheless instructive to our analysis and persuasive evidence...of the general assembly's intent'"). "[W]here the statements made on the floor are made only for purposes of clarification, they may be considered" in analyzing legislative history. *Com, v. Snyder*, 385 Pa. Super. 58, 76 n. 9, 560 A.2d 165, 174 n. 9 (1989). The Commonwealth Court has considered legislators' floor remarks in clarifying an ambiguous and opaque aspect of the RTKL. *See County of York v. Pennsylvania Office of Open Records*, 13 A.3d 594, 599-601 (Pa. Cmwlth. 2011).

During the floor debate on an earlier draft of the RTKL, an amendment was offered which would have included a statutory definition of "governmental function" as "[t]he performance, execution, implementation or exercise of authority of an agency in relation to its duties, responsibilities or authority." Pennsylvania House Legislative Journal, 2007 Reg. Sess. No. 97 at 2612 (October 30, 2007). Rep. John A. Maher, III interrogated the amendment's sponsor as to whether the proposed

---

more logical conclusion under the controlling standard is that the statutory requirements of publication of public notices and submission of annual audits are ancillary functions of local agencies.

definition "would say that an entity which performs a governmental function under a contract would then be subject to this legislation." *Id.* at 2613. In his questioning of the sponsor, Rep. Maher stated:

> By background, I am a CPA, an auditor. There are lots of auditing firms that do lots of audits for lots of governments, and many of which are required by statute that an audit be undertaken. Would all these audit firms then be subject to the open records law?

*Id.* The amendment's sponsor originally replied that he was "not going to get into hypotheticals back and forth about which contractor is in and which contractor is out," but then promptly withdrew his proposed amendment. *Id. See also SWB Yankees v. Wintermantel*, 2009 WL 3052903, at *9 n. 7 (Lacka. Co. 2009) (discussing above-quoted floor debate on a proposed "governmental function" definition), *aff'd*, 615 Pa. 640, 45 A.3d 1029 (2012). (T.P. 1/29/14 at pp. 47-51).

In construing a statute, legislative failure to adopt an amendment to a statute may be considered. *Allegheny Inspection Service. Inc. v. North Union Township*, 600 Pa. 245, 260, 964 A.2d 878, 887 (2009); *McDowell v. Good Chevrolet-Cadillac*, 397 Pa. 237, 245-245, 154 A.2d 497, 501-502 (1959). The above-quoted floor debate and contemporaneous withdrawal of the proffered definition of "governmental function" arguably reflects an intent to exclude accountants who conduct statutorily required audits from the scope of independent contractors that perform a "governmental function" on behalf of a local agency under Section 506(d)(1) of the RTKL. To the extent that any alleged ambiguity in the phrase "governmental

function" warrants clarification, the floor debate and legislative actions in the house of representatives reinforce the conclusion that an independent auditor does not perform a "governmental function" by conducting an audit of a local agency.

Based upon the foregoing, an accounting firm that completes an independent audit of a local agency does not "perform a governmental function" on behalf of that agency for purposes of 65 P.S. § 67.506(d)(1). For that reason, any records in the possession of Kelly & Associates relating to communications with NEIU board members are not discoverable under the RTKL even if those documents are not considered to be "work papers underlying [the NEIU] audit." Accordingly, Kelly & Associates' petition for review will be granted and the OOR's final determination dated August 12, 2013, will be reversed.

## ORDER

And now, this 12th day of February, 2014, upon consideration of the "petition for review of final determination of the Pennsylvania Department of open records" filed by petitioner, Brian T. Kelly and Associates, the memoranda of law submitted by the parties, the evidence presented during the hearing on January 29, 2014, and the post-hearing exhibits filed on February 7, 2014, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that the petition for review filed by petitioner, Brian T. Kelly and Associates, pursuant to 65 P.S. § 67.1302(a) is granted and that the final determination of the Pennsylvania office of open records dated August 12, 2013, is reversed.